**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

HEALTHMAX MEDICAL TECHNOLOGY
LTD.,

     Plaintiff,

        v.

ALL AMERICAN HEALTH LLC and
DANIEL LAUTURE,

     Defendants.

---

Civil Action No. 23-3296 (RK) (TJB)

**OPINION**

**KIRSCH, District Judge**

     **THIS MATTER** comes before the Court upon a Motion for Default Judgment, (ECF No. 33), filed by Plaintiff HealthMax Medical Technology Ltd. ("Plaintiff" or "HealthMax"). The Court has considered Plaintiff's Motion and its accompanying submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Plaintiff's Motion is **GRANTED**.

     **I.**     **BACKGROUND**

         **a.  FACTUAL BACKGROUND**

     This case arises out of a failed joint venture dating to the early days of the Covid-19 pandemic. (*See generally* First Amended Complaint ("FAC"), ECF No. 12.) HealthMax is a corporation existing under the laws of Hong Kong, with its principal place of business in Hong Kong. (FAC ¶ 1.) Defendant All American Health LLC ("AAH") is a limited liability company incorporated in Delaware, with its principal place of business in East Brunswick, New Jersey. (*Id.*¶ 2.) Plaintiff alleges that Defendant Daniel Lauture ("Lauture," together with AAH, "Defendants")

is the sole Member/owner of AAH and is in total control of AAH. (*Id.* ¶ 3.)[1] Plaintiff further alleges that Lauture is a resident of New Jersey, most recently residing at 522 West Harbor Place, West New York, New Jersey. (*Id.*)[2]

In or around May 2020, Zoe Wong ("Wong"), a member of HealthMax's Board of Directors, began negotiations with Lauture related to a proposed joint venture for the manufacture and sale of facemasks in the United States. (*Id.* ¶ 6.) HealthMax could produce these facemasks in China and sought a partner for entering and distributing in the U.S. market. (*Id.*) HealthMax alleges "Lauture claimed to be the trusted business partner that HealthMax needed, making numerous promises and representations . . . regarding his skills, abilities, and personal connections" to run the proposed business. (*Id.* ¶ 7.) Specifically, Lauture averred he was the right person to provide a facility for the operation of the business; to develop a sales network; to gain the requisite regulatory approvals –including from the Food and Drug Administration ("FDA") and the National Institute for Occupational Safety and Health ("NIOSH"); and to generally advance the U.S. business. (*Id.*) HealthMax alleges that in making these promises, Lauture embellished his background and "took advantage of HealthMax." (*Id.* ¶ 9.) In truth, HealthMax contends Lauture "lacked the skills, abilities, and personal connections to deliver on his promises." (*Id.*)

On or around June 16, 2020 HealthMax and AAH executed a Joint Venture Agreement ("JV Agreement"). (*Id.* ¶ 10; "JV Ag.", ECF No. 12-1; "Wong Cert.," ECF No. 33-3 ¶ 4, Ex. A.)

---

[1] As part of the litigation *Roswin Companies LLC and All American Health LLC v. Aurobindo Pharma Limited*, on February 1, 2022 Lauture certified in a complaint filed with the New Jersey Superior Court, Chancery Division, General Equity Part, Mercer County that he was the sole member of AAH. ("Mara Cert.," ECF No. 33-2 ¶ 15, Ex. B.) In settlement proceedings before the state court, Lauture also stated under oath that he was the sole member of AAH as of June 26, 2023. (Mara Cert., Ex. C at 106.) The Court takes judicial notice of these court records. It is unclear to the Court and seemingly to the Plaintiff whether the *Roswin* Companies action is directly related to the issues at hand in this action, ("MDJ," ECF No. 33-1 at 9), but the Court need not decide that issue here.

[2] Defendant's efforts to ascertain Lauture's current address are explained in depth in Defendant's "Motion for Substituted Service on Defendant Daniel Lauture." (ECF No. 11.)

The JV Agreement established a corporation under Delaware law, with its principal place of business in New Jersey, called American Products Unlimited, Inc. ("APU" or the "Venture"). (FAC ¶ 11.) Wong executed the JV Agreement on behalf of HealthMax, and Lauture executed it on behalf of AAH. (JV Ag. at 3.) The JV Agreement specified AAH and HealthMax, (defined as the "Members") wished "to enter an association for their mutual benefit and agree to organize, jointly invest in and operate a joint venture enterprise" that would be known as APU. (JV Ag. at 1.) The JV Agreement established that APU's primary business was for "the manufacture, distribution and sale of various types of protective face masks." (*Id.*) Under the JV Agreement's ownership structure, HealthMax would invest $10,000,000.10 for 300,000 shares and 60% ownership, and AAH would contribute $6,666,666.60 for 200,000 shares and 40% ownership. (*Id.* at 1–2.)

The JV Agreement specified each member's duties related to the Venture. HealthMax was responsible for: (1) providing all required equipment and machinery for APU's operations; (2) providing technical support for the manufacture of the facemasks; and (3) providing and "explor[ing] sources" for raw materials to be used in manufacturing. AAH's duties were: (1) securing a facility for the operation and management of the Venture: (2) providing and developing the sales network (i.e. customer list) for sales of the Venture's products; and (3) obtaining all required regulatory approvals for the Venture's products, including from the FDA and NIOSH. (*Id.* at 2.) In addition, the JV Agreement included a term titled "Non-Competition" which specified "[n]either Member, including any principal, member, and/or shareholder of a Member . . . may

have any interest in or engage in any business, trade, profession, or employment that is in competition" with APU's purpose. (*Id.* at 3.)[3]

Following execution of the JV Agreement in June 2020, Lauture was appointed the Chief Executive Officer ("CEO") of APU. (FAC ¶ 18.) As CEO, Lauture earned an annual salary and had control of APU's bank accounts at PNC Bank and TD Bank (the "Accounts"). (*Id.* ¶¶ 17, 47; *see generally* ECF No. 25.)

HealthMax states that it complied with all of its obligations as required by the JV Agreement. (FAC ¶ 15.) In June 2020 and thereafter, HealthMax shipped machinery and raw materials to New Jersey to be used by APU. (*Id.*) HealthMax transmitted $5,000,000 to APU in or around July 2020, and the remainder of its investment between October 2021 and July 2022. (*Id.* ¶ 12; Wong Cert. ¶¶ 28–48 (citing Ex. D, Ex. E).) In total, HealthMax alleges it transferred "at least" $9,450,000 to APU. (Wong Cert. ¶ 48 (citing Exs. D, E).)

HealthMax alleges that Defendants "patently failed to live up to the terms of the JV Agreement and entirely failed to position APU to engage in the business for which it was created." (FAC ¶ 19.) To date, APU has not set up manufacturing and "[d]espite millions invested . . . has not sold a single mask." (*Id.*)

Plaintiff contends Defendants violated numerous provisions of the JV Agreement. First, Plaintiff alleges that Defendants violated Paragraph 5(a) of the JV Agreement by failing to provide a manufacturing facility for APU, as well as Paragraph 8 by engaging in competition against the Venture. (*Id.* ¶20.) Plaintiff alleges that instead of finding a facility per the terms of the JV Agreement, Lauture engaged in self-dealing and signed a lease agreement with Roswin Companies

---

[3] The JV Agreement further set forth other logistical terms for the Venture's capitalization and ownership structure; the official language and currency; and the rules controlling the Board of Directors and Voting rights. (*Id.* at 1–2.)

LLC ("Roswin"), which he himself owns and controls.[4] Defendants signed a lease agreement (the "Lease Agreement") with Roswin for a facility in Lawrenceville, New Jersey, which required APU pay Roswin $90,000 per month in base rent plus additional charges and expenses. (*Id.*) APU's Chief Operating Officer Kavungal Tajudeen ("COO") executed the Lease Agreement on behalf of APU, and Lauture executed the Lease Agreement on behalf of Roswin. (*Id.* ¶ 21; Wong Cert. ¶ 8.) In November 2021, Roswin sent a letter to APU stating it had "failed to pay rent and quarterly additional rent payments" and threatened to terminate the lease agreement. (FAC ¶ 23; Wong Cert. ¶8.)

Plaintiff further alleges that Defendants violated Paragraph 5(c) of the Joint Venture by failing to obtain any of the required approvals for APU's products, including but not limited to from the FDA and NIOSH. (*Id.* ¶ 25.) To Plaintiff's knowledge, "every application for FDA or NIOSH approval that APU submitted has been rejected." (*Id.*)

Plaintiff also contends that Defendants "obfuscated the true nature of APU's lack of progress." (*Id.* ¶26.) In one example, Plaintiff alleges Defendants created a document entitled the "American Product Unlimited Business Plan" (hereafter, the "September 2021 Business Plan"). (*Id.*) The September 2021 Business Plan "exaggerated APU's progress and prospects for future success," by stating "[w]e expect to reach profitability by the middle of Year 2" and stating the gross profit margin "will exceed 100% and we will achieve break-even with sales of $20,000,000." (*Id.* ¶ 27.) The September 2021 Business Plan included additional sales projections and timelines that Plaintiff alleges did not comport with reality. (*Id.* ¶ 28.) In September 2021, Defendants also

---

[4] Lauture certified in *Roswin v. Aurobindo* that he was the "sole member" of Roswin on February 1, 2022. (Mara Cert., Ex. B at 24.) Further, on June 26, 2023, Lauture appeared in settlement proceedings in the same action in front of the Honorable Patrick J. Bartels of the Superior Court of New Jersey, Chancery Division, General Equity Part. (Mara Cert. at 97). In those proceedings, Lauture stated under oath that he was the sole member of both Roswin and AAH. (*Id.* at 106.)

created and transmitted a PowerPoint presentation (the "September 2021 Presentation") that Plaintiff alleges "severely exaggerated APU's progress and prospects for future success." (*Id.* ¶ 29.) The September 2021 Presentation stated that by the end of 2021, "APU ready to mass production [sic] of U.S. certified masks to the markets." (*Id.* ¶ 30) (sic in original). Further, the September 2021 Presentation stated APU had successfully built "essential components for the business" including the management team, key products, operations, and market connections. (*Id.* ¶ 31.) The September 2021 Presentation also stated FDA certification was "currently pending" and that "target date for mass production of medical grade masks" was "Q4 2021." (*Id.*)

HealthMax alleges that based on the September 2021 Business Plan, the September 2021 Presentation, and other oral and written communication between the parties, Plaintiff "justifiably understood that APU's progress was excellent, the company as well-positioned to begin mass producing and selling products in the very near future, and the company was likely to reach profitability within a short amount of time." (*Id.* ¶ 32.) However, HealthMax later learned these status updates were largely false. (*Id.* ¶ 33.)

In September 2022, Wong traveled to the United States to ascertain why APU had not begun manufacturing or selling masks. (*Id.* ¶ 35.) During this trip, Wong asked Lauture to show her APU's factory and provide her with an update on the state of the business. (*Id.*) It was during this trip that Wong was informed that APU's NIOSH application was rejected and that the products were not yet FDA approved. (*Id.*) The following month, Wong traveled again to the United States and met with Lauture, who informed her that APU's NIOSH application was rejected again, and stated—to Wong's surprise, that the company was running low on funds. In November 2022 Lauture sent a message to Wong, again notifying her that APU was running low on funds.

(*Id.* ¶ 37.) In December 2022, without notifying HealthMax in advance, Lauture shut down APU's operations and dismissed all personnel. (*Id.* ¶ 38.)

Prior to filing the subject lawsuit, Plaintiff repeatedly reached out to Lauture to obtain information regarding APU. (*Id.* ¶ 39.) Lauture failed to respond. (*Id.*) Plaintiff also sent sent a representative to the APU facility in New Jersey, who discovered it locked with materials and equipment inside. (*Id.* ¶ 40.) Plaintiff alleges these assets, worth an estimated "hundreds of thousands or millions of dollars" were abandoned. (*Id.*) Further, Plaintiff contends Defendants did not pay the required taxes and fees to keep APU in good standing with the Delaware Secretary of State. (*Id.* ¶ 41.)

On or around May 30, 2023, HealthMax, pursuant to the terms and procedures of the JV Agreement, appointed a new Board of Directors for APU (the "APU Board"). (*Id.* ¶ 44; see also JV Ag. at 2.) The APU Board elected Xian Zhang as APU's Chief Financial Officer ("CFO") with "exclusive power to access and control the company's bank accounts."[5] (FAC ¶ 45.) The APU Board also authorized Lauture's removal from the Accounts. (*Id.*) TD Bank and PNC Bank, however, were not willing to implement these measures, and refused to turn over control of the accounts without permission from Lauture. (*Id.* ¶ 47; Plourde Cert., ECF No. 13-2 ¶¶ 9–20.) Plaintiff thereafter filed suit.

### b. PROCEDURAL HISTORY

Plaintiff filed their initial complaint on June 15, 2023 (ECF No. 1). On August 15, 2023 Plaintiff filed the First Amended Complaint ("FAC," ECF No. 12) and its first Motion for an Order to Show Cause with Temporary Restraints, seeking to obtain control of APU's bank accounts.

---

[5] The JV Agreement provides the CFO role may be appointed by a simple majority vote of the five-member Board of Directors. (Ex. A at 2.) HealthMax has the right under the agreement to appoint three members to the Board. (*Id.*)

(ECF No. 13). Plaintiff asserted claims for (1) breach of contract based on the aforementioned breaches of the JV Agreement; (2) breach of the implied covenant of good faith and fair dealing based, *inter alia*, on Defendants' failures to keep HealthMax informed regarding the status of the APU and their misstatements to APU regarding APU's status; (3) breach of fiduciary duty; (4) an equitable cause of action to pierce the corporate veil; and (5) an equitable accounting action.[6] (FAC ¶¶ 50–89.)

On August 17, 2023 the Court granted Plaintiff's Motion for a Temporary Restraining Order and ordered the Accounts frozen pending determination of Plaintiff's Motion for a Preliminary Injunction. (ECF No. 14 at 2.) After a series of motions and letters to this Court, counsel for Lauture acknowledged service on September 12, 2023. (ECF No. 19.) On September 28, 2023, the Court held a telephonic hearing on Plaintiff's request for preliminary injunction. (ECF No. 23.) Neither counsel for Defendants nor Defendants participated. (*Id.*) The Court ordered Counsel for Lauture to file a Notice of Appearance within 72 hours, and scheduled a renewed Show Cause Hearing on the issue of the preliminary injunction for October 10, 2023. Plaintiff filed an Amended Motion for a Preliminary Injunction on September 29, 2023. (ECF No. 25.) Defendant did not file any opposition to Plaintiff's Motion or appear at the October 10 hearing. (ECF No 27.) Following a Show Cause hearing on October 10, 2023, at which Defendants again did not participate, the Court granted Plaintiff's Amended Motion for a Preliminary Injunction on the same day. (ECF No. 28.) The Court ordered that PNC Bank and TD Bank authorize the change in signatories to APU's newly appointed CFO such that APU could access the accounts and remove Lauture, and anyone else, from the accounts. (*Id.*)

---

[6] Count Six sought a declaratory judgment from the Court related to APU's bank accounts, which were mooted by the Court's grant of the PI. (FAC ¶¶ 90–97; MDJ at 7 n.1.)

Once APU gained access to the Accounts, it and HealthMax were able to review the account statements and understand APU's current financial status. (Wong Cert. ¶ 30 (citing Ex. D, Ex. E).) HealthMax discovered numerous unexplained transfers out of the accounts. including a transfer of $4,000,000. (*Id.* ¶ 34.) The APU Board discovered the Accounts were effectively drained—the TD Bank account held an ending balance of $0.00, and the PNC Bank account showed a balance of $107.36. (*Id.* 30–48.)

To date, Defendants failed to answer or otherwise respond to Plaintiff's FAC, file a Notice of Appearance, or otherwise appear in this case beyond acknowledging service. (*See* ECF No. 26.) Plaintiff requested the Clerk's Entry of Default on October 18, 2023, which was granted. (ECF No. 29) On June 21, 2024 Plaintiff filed a Motion for Default Judgment as to all Defendants. (ECF No. 33.) Defendants did not file a brief in opposition or otherwise respond to Plaintiff's Motion.

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 55 permits a party to apply for and the court to enter default judgment against a party that fails to plead or otherwise defend claims asserted against it. Fed. R. Civ. P. 55(b)(2). "The entry of a default judgment is largely a matter of judicial discretion, although the Third Circuit has emphasized that such 'discretion is not without limits . . . .'" *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 535 (D.N.J. 2008) (quoting *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984)). "Because the entry of a default judgment prevents the resolution of claims on the merits, '[the Third Circuit] does not favor entry of defaults and default judgments.'" *Loc. 365 Pension Fund v. Kaplan Bros. Blue Flame Corp.*, No. 20-10536, 2021 WL 1976700, at *2 (D.N.J. May 18, 2021) (quoting *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194 (3d Cir. 1984)).

Before entering a default judgment pursuant to Rule 55(b), a court performs a thorough analysis of a plaintiff's claims and entitlement to relief. *First*, the defendant must have been properly served. *See Gold Kist, Inc. v. Laurinburg Oil Co.*, 756 F.2d 14, 19 (3d Cir. 1985). *Second*, the court must have subject matter jurisdiction over the dispute and personal jurisdiction over the parties. *See Mark IV Transp. & Logistics v. Lightning Logistics, Inc.*, 705 F. App'x 103, 108 (3d Cir. 2017). *Third*, the complaint must sufficiently state a cause of action. *See Chanel, Inc.*, 558 F. Supp. 2d at 536 (citing *Directv, Inc. v. Asher*, No. 03-1969, 2006 WL 680533, at *1 (D.N.J. Mar. 14, 2006)). *Fourth*, the court must weigh the three default judgment factors: (1) whether the party subject to the default has a meritorious defense, (2) whether the party seeking default would be prejudiced without it, and (3) whether the default resulted from the defendant's culpable conduct. *Tri-Union Seafoods, LLC v. Ecuatorianita Imp. & Exp. Corp*, No. 20-9537, 2021 WL 1541054, at *7 (D.N.J. Apr. 20, 2021) (citing *Days Inns Worldwide, Inc. v. Jinisha Inc.*, No. 14-6794, 2015 WL 4508413, at *2 (D.N.J. July 24, 2015)). *Finally*, the plaintiff must have proven damages. *See Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990).

In making these determinations "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *DIRECTV, Inc. v. Pepe*, 431 F.3d 162, 165 n.6 (3d Cir. 2005) (quoting *Comdyne I, Inc.*, 908 F.2d at 1149). "While the court may conduct a hearing to determine the damages amount, Fed. R. Civ. P. 55(b)(2), a damages determination may be made without a hearing as long as the court ensures that there is a basis for the damages specified in the default judgement." *Days Inns Worldwide, Inc. v. Panchal*, No. 15-1459, 2015 WL 5055318, at *2 (D.N.J. Aug. 25, 2015).

### III.   **DISCUSSION**

#### a. PROPER SERVICE

A court may only enter default judgment against defendants who were properly served. *Teamsters Pension Fund of Phila. & Vicinity v. Am. Helper, Inc.*, No. 11-624, 2011 WL 4729023, at *2 (D.N.J. Oct. 5, 2011) (citing *Gold Kist,* 756 F.2d at19). When located in the United States, an entity defendant, such as a corporation or LLC, may be served "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(h)(1)(B). The plaintiff "bears the burden of proof" of demonstrating service was proper. *Grand Entm't Grp. v. Star Media Sales*, 988 F.2d 476, 488 (3d Cir. 1993) (citation omitted). The plaintiff can meet this burden "by a preponderance of the evidence using affidavits, depositions, and oral testimony." *Mills v. Ethicon*, 406 F. Supp. 3d 363, 392 (D.N.J. 2019) (citation omitted). An individual defendant may be served in a judicial district by "following state law for serving a summons in an action brought . . . in the state where the district court is located or where service is made" or by, among other options, "delivering a copy . . . to an agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(e).

On June 27, 2023, Plaintiff submitted a certification demonstrating that on June 22, 2023, the Summons and Complaint, along with a copy of the JV Agreement,," were served on Tara D'Ottavio, a Corporate Specialist at Universal Registered Agents authorized to accept service on behalf of AAH. (ECF No. 8). AAH's "Entity Details" with Delaware's Department of State's Division of Corporations list Universal Registered Agents, Inc. as its registered agent. (Mara. Cert. ¶ 14 (citing to JV Ag.).) The Court finds that AAH was properly served through its registered agent under Rule 4(e)(2)(C).

On September 12, 2023 counsel for Lauture signed an "Acknowledgement of Service of Summons, Complaint and First Amended Complaint." (ECF No. 19.) Under New Jersey law, "acceptance of the service of a summons, signed by the defendant's attorney . . . shall have the same effect as if the defendant had been properly served." N.J. Ct. R. R. 4:4-6; *see also Staskewicz v. Harrington Corp.*, No. 10-3361, 2011 WL 976498, at *1 (D.N.J. Mar. 14, 2011) ("[S]ervice is proper under New Jersey law when a defendant executes an acknowledgement of service."). As such, the Court finds the Acknowledgment of Service renders Lauture properly served under the laws of New Jersey.[7] Accordingly, Plaintiff has established by a preponderance of the evidence that the Defendants were properly served.

### b. JURISDICTION

The Court next turns to whether it may exercise subject matter jurisdiction over this case and personal jurisdiction over the parties. As the party asserting diversity jurisdiction, Plaintiff "bear[s] the burden of proving diversity of citizenship by a preponderance of the evidence." *In re Lipitor Antitrust Litig.*, 855 F.3d 126, 150 (3d Cir. 2017), *as amended* (Apr. 19, 2017) (citing *Freidrich v. Davis*, 767 F.3d 374, 377 (3d Cir. 2014)). Plaintiff is a foreign corporation based in Hong Kong. (FAC ¶ 1.) Defendants are a New Jersey resident and a limited liability company whose principal place of business is based in New Jersey and whose sole member is a resident of New Jersey. (FAC ¶¶ 2–3.) Plaintiff alleges damages in the amount of at least $9,449,892.64. (MDJ at 4.) The Court finds it has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(2) given there is complete diversity of citizenship between the parties and the amount in controversy is over $75,000.

---

[7] Moreover, as Plaintiffs allege that Lauture is the sole member of AAH, Lauture's counsel's signature also serves as a basis to find AAH served under Rule 4(h)(1)(B).

The Court now turns to the question of personal jurisdiction over the defendants. "A natural person is deemed to be a citizen of the state where she is domiciled." *Swiger v. Allegheny Energy, Inc.*, 540 F.3d 179, 182 (3d Cir. 2008). Lauture is a resident of New Jersey, and the Court may therefore exercise personal jurisdiction over him. Accordingly, the Court may also exercise personal jurisdiction over AAH. "[T]he citizenship of a limited liability company 'is determined by the citizenship of each of its members.'" *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 348 (3d Cir. 2013) (quoting *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010)). Lauture is the only member of AAH and is a resident of New Jersey, thus empowering this Court to exercise personal jurisdiction over his limited liability companies. (FAC ¶ 3.)

### c. SUFFICIENCY OF COMPLAINT

The third factor the Court must consider is "whether the moving party's complaint establishes a legitimate cause of action." *La. Counseling & Fam. Servs., Inc. v. Makrygialos, LLC*, 543 F. Supp. 2d 359, 365 (D.N.J. 2008); *see also Animal Science Prods., Inc. v. China Nat'l Metals & Minerals Import & Export Corp.*, 596 F. Supp. 2d 842, 848 (D.N.J. 2008) ("A litigant's failure to state a claim upon which relief may be granted . . . prevents the presiding court from entering a default judgment.").

While Plaintiff argues it has brought a *prima facie* case sufficient to support all claims alleged in the FAC, HealthMax focuses on Counts One through Three in its Motion for Default Judgment. (MDJ at 7 n.1.) In Counts One and Two, Plaintiff asserts a breach of contract claim and a related claim for breach of the implied covenant of faith and fair dealing. (FAC ¶¶ 50–68.) In Count Three, Plaintiff alleges a breach of fiduciary duty. (*Id.* ¶¶ 69–73.) In Count Four, Plaintiff

brings a cause of action based on piercing the corporate veil, and in Count Five it brings a cause of action requesting equitable accounting relief.[8]

*1. Count One: Breach of Contract*

First, the Court finds that Plaintiff has set forth a legally sufficient breach of contract claim against AAH and Lauture. To establish a breach of contract under New Jersey law, Plaintiff must allege "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007) (internal citation omitted). Here, Plaintiff proffers the JV Agreement as the signed contract between the parties and the basis for the breach of contract claim. (FAC ¶ 16 (citing Exhibit A, ECF No. 12-1).) AAH's obligations included securing a facility for the operation and management of APU; providing and developing a sales network for APU's products; and obtaining all required approvals for APU's products. Plaintiff alleges AAH failed in all its obligations given the factory is now abandoned with valuable machinery inside, the products never received regulatory approval, and there was never a sales list developed or promulgated. (FAC ¶¶ 53-56.) Plaintiff further alleges that the JV Agreement barred Defendants from engaging in competition against APU, which Defendants violated via their self-dealing through the *Roswin* entity and the Lease Agreement for the manufacturing property. As such, Plaintiff has sufficiently alleged Defendants breached JV Agreement Paragraphs 5(a)–5(c), and 8.

---

[8] Plaintiff admits Count Six was mooted by the Court's Order on October 10, 2023. (ECF No. 28.) Plaintiff did not submit briefing on Count Five in the Motion for Default Judgment, so the Court does not reach Count Five in this Opinion. (*See generally* MDJ.) If necessary for enforcement of this judgment, Plaintiff may submit a renewed request to the Court explaining additional relief it seeks.

2. *Count Two: The Implied Covenant of Good Faith and Fair Dealing*

The Court also finds that Plaintiff has sufficiently alleged a claim for breach of the covenant of good faith and fair dealing. "Every contract governed by New Jersey law contains an implied covenant of good faith and fair dealing." *Cedar Holdings, LLC v. Menashe*, No. 16-7152, 2017 WL 1349321, at *3 (D.N.J. Apr. 7, 2017) (citing *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 288 (3d Cir. 2000)). The implied covenant of good faith and fair dealing "requires that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Black Horse Lane*, 228 F.3d at 288 (internal citations omitted); *see also R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 168 N.J. 255, 277 (2001) (same). "A party to a contract breaches the covenant if it acts in bad faith or engages in some other form of inequitable conduct in the performance of a contractual obligation." *Id.* (internal citations omitted); *see also Iliadis v. Wal-Mart Stores, Inc.*, 191 N.J. 88, 109 (2007) ("Good faith entails adherence to community standards of decency, fairness or reasonableness") (internal citations omitted); *Ass'n Grp. Life, Inc. v. Cath. War Veterans of U. S. of Am.*, 61 N.J. 150, 154 (1972) (finding a party breached the covenant where it acted in a manner "not contemplated by the spirit of the contract" and the behavior "fell short of fair dealing").

"Where a party has breached a specific term of a contract, that party cannot be found separately liable for breaching the implied covenant of good faith and fair dealing when the two asserted breaches basically rest on the same conduct." *760 New Brunswick Urb. Renewal Ltd. Liab. Co. v. Navigators Specialty Ins. Co.*, No. 20-5877, 2021 WL 287876, at *6 (D.N.J. Jan. 28, 2021) (quoting *Spellman v. Express Dynamics, LLC*, 150 F. Supp. 3d 378, 379 (D.N.J. 2015)). While "[t]here is no universally accepted test for establishing a breach of the duty of good faith and fair dealing" typically two elements appear: "(1) the defendant acts in bad faith or with a

malicious motive to (2) deny the plaintiff some benefit of the bargain originally intended by the parties, even if that benefit was not an express provision of the contract." *Yapak, LLC v. Mass. Bay Ins. Co.*, No. 09-3370, 2009 WL 3366464, at *2 (D.N.J. Oct. 16, 2009) (citing *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 225 (2005)).

The Third Circuit has stated that "Section 205 of the Restatement (Second) of Contracts provides examples of the types of behavior that can give rise to a claim for breach of the implied duty of good faith and fair dealing in the context of one's performance under a contract." *Black Horse Lane*, 228 F.3d at 288. The Third Circuit in *Black Horse Lane* quoted Section 205's analysis that while "[a] complete catalogue of types of bad faith is impossible" examples "recognized in judicial decisions" include "evasion of the spirit of the bargain" and "lack of diligence and slacking off." *Id.* (quoting Restatement (Second) of Contracts § 205).

Here, Plaintiff alleges Defendants' bad faith went beyond the terms of the contract—namely, that Defendants routinely misrepresented the state of APU to HealthMax via the September 2021 Presentation and the September 2021 Business Plan, as well as via other communication. (*See, e.g.*, FAC ¶¶ 26–33.) These misrepresentations regarding the lease agreement, the likelihood of FDA and NIOSH approval, and misrepresentations regarding financial matters are separate from Defendants' contractual failures under the JV Agreement, although entwined. Accordingly, the Court finds Plaintiff has sufficiently alleged bad faith conduct from the Defendants rising to the levels contemplated by New Jersey law and that are not duplicative of Plaintiff's breach of contract claims. *See, e.g., Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 246 (2001) (collecting cases regarding judicial findings of bad faith and breaches of the implied covenant under New Jersey Law).

### 3.   Count Three: Breach of Fiduciary Duty

Plaintiff argues that AAH owed a fiduciary duty to HealthMax due to the JV Agreement, and that Lauture owed an additional fiduciary duty to HealthMax in his role as APU's CEO. (FAC ¶¶ 70–71.) To sustain a claim for breach of fiduciary duty, a Plaintiff must allege "1) the existence of a fiduciary duty or relationship between the parties; 2) breach of that duty; and 3) resulting damages." *Read v. Profeta*, 397 F. Supp. 3d 597, 633 (D.N.J. 2019) (citation omitted).

Plaintiff alleges that Lauture violated his fiduciary duty to HealthMax in his role as APU's CEO. As CEO, Lauture had a fiduciary duty to APU's shareholders, including HealthMax. *United Artists Theatre Co. v. Walton*, 315 F.3d 217, 231 n.14 (3d Cir. 2003) ("[D]irectors and officers are fiduciaries of the corporations they serve.") Further, under New Jersey law, "[t]here can be no question that joint venturers owe each other a fiduciary duty." *Lo Bosco v. Kure Eng'g Ltd.*, 891 F. Supp. 1020, 1033 (D.N.J. 1995); *see also Starland v. Fusari*, No. 10-4930, 2015 WL 5771617, at *6 n.4 (D.N.J. Sept. 3, 2015) ("[T]here can be no question that joint venturers owe each other a fiduciary duty because the relation of joint venturers . . . is fiduciary, one of trust and confidence, calling for the utmost good faith, permitting of no secret advantages or benefits") (internal citations omitted). As Plaintiff's joint venture partner, the Court finds that AAH and Plaintiff had a fiduciary relationship. The fiduciary duties thrust upon Defendants included a "duty of loyalty . . . to avoid conflicts of interest" and to "conduct [] the business . . .  honestly and in good faith" with the company's best interests in mind. *Swift v. Pandey*, No. 13-649, 2013 WL 6022093, at *9 (D.N.J. Nov. 13, 2013) (internal citations and quotation marks omitted); *see also In re ORFA Sec. Litig.*, 654 F. Supp. 1449, 1456 (D.N.J. 1987) ("The fiduciary duty to abstain from self-dealing is enforceable under the common law of New Jersey."). A fiduciary also breaches their duties when

they "use[] his or her position for personal benefit . . . comparable to that implicated by embezzlement." *United States v. Badaracco*, 954 F.2d 928, 938 (3d Cir. 1992).

Accordingly, the Court finds that both Defendants had fiduciary relationships with Plaintiff. Further, the facts as alleged supports Plaintiff's claim that AAH and Lauture breached that duty, resulting in damages in the form of the total loss of Plaintiff's investment. (*See* Wong Cert. Exs. D, E.) Among other allegations, Plaintiff contends that Defendants made false representations regarding the status of the Joint Venture, (FAC ¶¶ 36–33), entered into self-dealing lease agreements, (*id.* ¶¶ 20–23), and made unauthorized transfers from the Accounts, leaving the Accounts depleted with essentially no funds remaining for APU, (Wang Decl. ¶¶ 31–48.) As such, HealthMax lost over $9.4 million of the money it transferred to APU. (*Id.* ¶ 48.) Therefore, the Court finds that Plaintiffs sufficiently set forth a breach of fiduciary duty claim.

### 4. Piercing the Corporate Veil

Plaintiff also seeks equitable relief in the form of piercing the corporate veil. "[V]eil piercing is an equitable tool that, in limited circumstances, allows courts to disregard corporate formalities." *Bell Container Corp. v. Palagonia Bakery Co. Inc.*, No. 19-6545, 2022 WL 2439532, at *5 (D.N.J. July 5, 2022) (citing *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001)). This applies in cases where "[a]n individual ... was using the corporation as his alter ego and abusing the corporate form in order to advance his personal interests." *Balanced Bridge Funding LLC v. Mitnick L. Off., LLC*, No. 21-20512, 2022 WL 3593892, at *3 (D.N.J. Aug. 23, 2022) (quoting *New Jersey Dep't of Env't Prot. v. Navillus Grp.*, No. A-4726-13T3, 2015 WL 9700541, at *8 (N.J. Super. Ct. App. Div. Jan. 14, 2016). "[P]iercing the corporate veil is not a mechanism by which legal liability is imposed *per se*, but rather an equitable remedy designed to remedy a fundamental unfairness perpetrated under the guise of the corporate form." *Linus*

*Holding Corp. v. Mark Line Indus., LLC*, 376 F. Supp. 3d 417, 425 (D.N.J. 2019) (citing *State, Dep't of Env't Prot. v. Ventron Corp.*, 94 N.J. 473, 500 (1983)). Yet "even in instances where one individual shareholder or director dominates the corporate entity, liability generally is imposed only where the [dominant party] has abused the privilege of incorporation by using the [corporate form] to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Id.*

In New Jersey, "two elements must be shown to pierce the corporate veil: 'First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist. Second, the circumstances must indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.'" *Id.* (quoting *State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F.Supp.2d 668, 679 (D.N.J. 2009)). "In other words, the corporation must be the 'alter ego' of the shareholder, such that the corporate form is effectively a legal fiction, and enforcing that legal fiction must result in some fundamental unfairness." *N. Am. Steel Connection, Inc. v. Watson Metal Prod. Corp.*, 515 F. App'x 176, 180 (3d Cir. 2013) (quoting *Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 387 N.J. Super. 160, 199 (App. Div. 2006)). The party seeking to pierce the veil bears the burden to show the required circumstances are present. *Id.*

To satisfy the first prong, courts have followed six non-binding factors set out by the Third Circuit in *Craig v. Lake Asbestos of Quebec, Limited.* 843 F.2d 145, 150 (3d Cir. 1988). In *Lake Asbestos*, the Third Circuit concluded "that satisfying the first prong of the veil-piercing analysis requires 'complete domination, not only of finances but of policy and business practice,' such that the corporate entity has 'no separate mind, will or existence of its own.'" *Watson Metal*, 515 F. App'x at 180 (quoting *Lake Asbestos of Quebec*, 843. F.2d at 150.)

Factors demonstrating that level of dominance include:

> gross undercapitalization . . . failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Id.* (quoting *Lake Asbestos of Quebec*, 843. F.2d at 150.) The Third Circuit has since held that "[a]s those factors indicate, the veil-piercing inquiry is focused not simply on an individual shareholder's level of personal involvement with a corporation, but rather on whether the corporate form itself is a sham." *Id.*

To reach the second element for equitable veil piercing in New Jersey, "a plaintiff need not prove common law fraud but instead demonstrate that the defendants, via the corporate form, perpetrated 'a fraud, injustice, or the like,' a less exacting standard." *Balanced Bridge Funding*, 2022 WL 3593892, at *4 (citing *Linus*, 376 F. Supp. 3d at 425).

Plaintiff successfully alleges the circumstances in this case support veil piercing. Regarding the first element of unity of interest, Plaintiff sufficiently alleges that Lauture, as sole owner of AAH, has abused the corporate form to protect his own self-dealings, and that court records in New Jersey Superior Court support that AAH is merely an alter ego created shortly prior to entering into the JV Agreement with HealthMax. (MDJ at 9; *see also* Mara Cert. Exs. B, C, D, E.) Here, Plaintiff has demonstrated several of the Third Circuit's non-binding factors, including (1) absence of corporate records, (2) the fact that the corporation is a façade for the operations of the dominant stockholder, (3) failure to observe corporate formalities, and (4) the apparent undercapitalization of AAH as demonstrated by public records filed with the New Jersey Superior Court. (*See generally* FAC.) Further, public court records include, as noted above, a statement

under oath by Lauture in New Jersey Superior Court in July 2023 stating that he was the sole member of both AAH and Roswin. (Mara Cert. at 106.)

The Third Circuit has used the example "siphoning of funds of the corporation by the dominant stockholder," as a typical example of behavior that justifies a court's decision to disregard the corporate form. *Watson Metal Prod. Corp.*, 515 F. App'x at 181 (internal citation omitted). Plaintiff has sufficiently alleged Lauture, in his dual role as CEO of APU and sole member of AAH, used AAH to bilk and mislead Plaintiff into investing millions of dollars into a venture that seems to have primarily served as a pass-through via which Lauture transferred himself or an unknown third party HealthMax's entire investment. This Court finds that the evidence in the record shows Lauture dominated AAH, and that AAH's corporate form is effectively a sham for Lauture's own dealings. As such, the Court finds Plaintiff has sustained a claim for equitable veil piercing under New Jersey law.

### d. DEFAULT JUDGMENT FACTORS

Next, the Court considers the three default judgment factors: "(1) whether the party subject to default has a meritorious defense, (2) the prejudice suffered by the party seeking default, and (3) the culpability of the party subject to default." *Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds*, 250 F.R.D. 171, 177 (D.N.J. 2008) (citing *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 74 (3d Cir. 1987)). The Court finds that each of the three factors weighs in favor of entering default judgment in this case.

First, in the absence of any responsive pleading, the Court's review of the Complaint reveals no meritorious defense open to the Defendants. *See Ramada Worldwide Inc. v. Courtney Hotels USA, LLC*, No. 11-896, 2012 WL 924385, at *5 (D.N.J. Mar. 19, 2012) ("assum[ing] that the Defendants have no litigable defenses available" because they "have not filed anything with the Court," "have offered no defense," and "the facts asserted in the complaint do not contain any

information that could provide the basis for a meritorious defense"); *see also Rose Containerline, Inc. v. Omega Shipping Co.*, No. 10-4345, 2011 WL 1564637, at *3 (D.N.J. Apr. 25, 2011) (same); *Carpenters Health & Welfare Fund of Phila. v. NDK Gen. Contractors, Inc.*, No. 06-3283, 2007 WL 1018227, at *1 (E.D. Pa. Mar. 29, 2007) ("Defendant has filed no responsive pleading and the record before the court does not reveal any 'litigable defense.' The court must therefore presume that defendant has none.").

Second, Plaintiff has been prejudiced by the Defendants' failure to appear, defend, or otherwise respond to the Complaint in this case because Plaintiff has no other means of seeking relief from these Defendants. *See Gowan v. Cont'l Airlines, Inc.*, No. 10-1858, 2012 WL 2838924, at *2 (D.N.J. Jul. 9, 2012) ("[Plaintiff] will suffer prejudice if the Court does not enter default judgment as Plaintiff[s] [have] no other means of seeking damages for the harm caused by Defendant."); *Teamsters Pension Fund of Phila. & Vicinity v. Am. Helper, Inc.*, 2011 WL 4729023, at *4 (D.N.J. Oct. 5, 2011) (finding that a defendant's failure to answer prejudices the plaintiff).

Finally, the Court finds the Defendants responsible for their failure to appear in this litigation because "there is nothing before the Court to show that [their] failure to file an answer was not willfully negligent." *Teamsters*, 2011 WL 4729023, at *4; *U.S. v. Cruz*, No. 20-3903, 2021 WL 1884862, at *2 (D.N.J. May 11, 2021) ("Defendants['] failure to answer or otherwise respond to the Complaint, without providing any reasonable explanation, permits the Court to draw an inference of culpability on its part."); *Prudential Ins. Co. of Am. v. Taylor*, No. 08-2108, 2009 WL 536403, at *1 (D.N.J. Feb. 27, 2009) ("[T]here was nothing before the Court to suggest that anything other than [defendant's] willful negligence caused her failure to file an answer, and she was therefore culpable."). Indeed, there appears to be no question that the Defendants are aware

of this action, especially as Lauture's counsel filed an acknowledgement of service on the docket. (MDJ at 11; ECF No. 19.) Accordingly, each of the three default judgment factors counsels in favor of entering default judgment against the Defendants.

e. **DAMAGES**

Finding default judgment warranted, the Court turns to the issue of damages. As noted above, while the factual allegations of a complaint are taken as true on a motion for default judgment, a plaintiff must prove the amount of damages with certainty. *Comdyne*, 908 F.2d at 1149. In order to determine whether a plaintiff has sufficiently proven damages, Rule 55(b) permits the Court to "conduct such hearings or order such references as it deems necessary and proper." *Id.* (quoting Fed. R. Civ. P. 55(b)(2)). However, the Court is not required to conduct such hearings "as long as it ensures that there is a basis for the damages specified in the default judgment," *Trucking Emps. of North Jersey Welfare Fund, Inc.-Pension Fund v. Caliber Auto Transfer, Inc.*, No. 08-2782, 2009 WL 3584358, at *3 (D.N.J. Oct. 27, 2009) (citation and quotation marks omitted), such as when "detailed affidavits and documentary evidence" have been submitted to support the plaintiff's claim for damages. *Doe v. Simone*, No. 12-5825, 2013 WL 3772532, at *2–*3 (D.N.J. July 17, 2013) (citation omitted); *see also Comdyne*, 908 F.2d 1142 at 1149 (citation omitted) (damages sought at default judgment should be for a "sum certain or for a sum which can by computation be made certain . . . .").

Here, Plaintiff requests that the Court enter judgment against the Defendants in the amount of $9,449,892.64. This is equal to the amount Plaintiff confirmed via the account statements that it transferred to APU, and which since have been transferred out of the Accounts. (MDJ at 4, 12.)

If the damages are for a "sum certain or for a sum which can by computation be made certain, a further evidentiary inquiry is not necessary and a district court may enter final judgment." *Simone*, 2013 WL 3772532, at *3 (citing *Bds. of Trs. of Operating Eng'rs Loc. 825 Welfare Fund*

*v. Robert Silagy Landscaping Inc.*, No. 06-1795, 2006 WL 3308578, at *4 (D.N.J. Nov. 13, 2006)). Here, Plaintiff has attached the PNC Bank and TD Bank account statements showing transfers from HealthMax into APU accounts that were otherwise emptied, as well as the sworn Wong certification regarding HealthMax's original investment and the validity of the subsequent transfers out of the Accounts. (*See* Wong Cert., Exs. D, E).

Plaintiff has also submitted sufficient evidence that rebuts any presumption that those operating funds might have gone to legitimate purposes or costs during the life of APU, particularly with regards to APU's monthly rent and operating fees related to the manufacturing facility. (*See* FAC ¶ 20; MDJ at 10; Wong Cert.¶ 8.) To the extent APU did actually pay rent or other fees for the manufacturing facility it occupied, Wong's affidavit and other evidence provided by the Plaintiff sufficiently show it was merely cover for Lauture to siphon money from APU in the form of "rent" paid to himself, as sole member and owner of Roswin. (*See* FAC ¶ 20; MDJ at 10; Mara Cert., Exs. B, C, D, E.)

Based on Plaintiff's submissions, the Court finds Plaintiff has adequately established damages in this case. *See Werremeyer v. Shinewide Shoes, Ltd.*, No. 19-10228, 2023 WL 8878129, at *1 (D.N.J. Dec. 22, 2023) (finding sufficient proof of Plaintiff's contract damages when Plaintiff submitted sworn proof from individuals with personal knowledge of the damages at issue); *see also United States v. Master Fire Prot.*, No. 16-8755, 2018 WL 456026, at *3 (D.N.J. Jan. 17, 2018) (finding account transcripts and a sworn affidavit supported plaintiff's entitlement to relief by default judgment).

IV.   **<u>CONCLUSION</u>**

For the reasons set forth above, Plaintiff's Motion for Default Judgment, (ECF No. 33), is **GRANTED**, and the Court enters default judgment against all Defendants. An appropriate Order and Judgment accompanies this Memorandum Opinion.

_____
ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

<u>Dated</u>: August 6, 2024